Our first case up this morning is 412-0042, Zaffiri v. Pontiac RV Inc. et al. For the appellant is Kevin Devlin, you are he, sir? And we have three people signed up for appellee, Melissa Stewart, you are she? Bradley Falcoff, is that pronounced correctly, sir? Yes. And Daniel Wright, you are he? Yes. Are you all going to argue? Yes. Have you checked with the clerk on the time? No. Okay. Then, Mr. Devlin, you may proceed. Justices, counsel, if it may please the court. Counsel. Kevin Devlin on behalf of James and Robert Zaffiri. Starting with count two against Pontiac RV, an implied warranty for merchantability cause of action, the UCC in section 1305 says the UCC is to be liberally construed. The purpose of it is to put the buyer in as good a position as if the seller performed under the contract. It's Pontiac RV's position and relies upon causement that says if there's no defect at the time of delivery, there's no cause of action. But Industrial Steel Service Center, a federal case out of Northern District of Illinois, said the requirement to be defective at delivery is not the same as to be discovered at time of delivery. In that case, the defect was discovered one and two-thirds years later. In our brief, we cited Nash, Hodges, Lupa, Dangle, Durham, Potter, and Jackson where cases of a toaster's five-year-later defect was discovered, a ten-year-old car with a defective air conditioner, a two-and-a-half-year-old refrigerator became defective, a five-year-old minivan's transmission went defective, two-year-old modular home's roof began to leak, an insulated motor home, a one-and-a-half-year-old car that was driven 28,000 miles, and in Tweedy where brakes failed on a car after 7,500 miles and the defect was found. Interesting to note in Hodges, it was the Supreme Court of Kansas that said, a seller may not have known of the defect at the time of the sale, but there is no requirement for a buyer to establish that the seller knew of the defect. It's Pontiac RV's position that the plaintiff waived this cause of action by not pleading it in the Fourth Amendment complaint. But the plaintiffs did plead it in the Fifth Amendment complaint in order to preserve the appeal. And in Wade, the Fourth District Court of Appeals said, a decision to allow amendments is in the sound discretion of the trial court and will not be overturned absent abuse. Pontiac RV further takes the position that the language in the complaint, saying it was an unfit merchandise, is insufficient. However, the Fourth District Court held in Carpenter that the same language is sufficient. Finally, in Federal Insurance Company, the court said, whether or not a warranty exists and whether a breach of a warranty has occurred is a question of fact for the jury. Addressing Count 9 against Crane for implied warranty of merchantability cause of action, Crane relies on the argument that privity is required. The Illinois Supreme Court in Collins in 1988 said, we leave the door open or at least slightly ajar for future extensions of some warranties in appropriate circumstances to non-privity plaintiffs. This is the appropriate case for it as Alpha, the manufacturer of the motorhome, has gone into liquidation. They're insolvent. Why should Crane be able to claim privity now because of Alpha's bankruptcy? The Supreme Court in Collins cited Whitaker in an appellate court decision in 1887, which stood for the cause of action for breach of implied warranty for merchantability and fitness for a particular purpose are not barred by plaintiff's lack of privity with the defendant. In Crest Container, the privity was not required when the remote manufacturer knew the identity, purpose, and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements. Here, these are wall panels to a motorhome. It's specifically wall panels to the exterior walls of a motorhome. They know the purpose of it. The purpose is to keep it watertight, dry against snow, rain, grime, and so it doesn't blister, allow water to come in and form mold and make the $161,000 motorhome worthless. In Rhodes Pharmacal, the appellate court abrogated the privity requirement on a third-party basis. The question for this appellate court is why should Crane benefit from Alpha going into bankruptcy? Addressing Count 3 against Pontiac RV and Count 10 against Crane, the implied warranty for fitness for a particular purpose cause of action, there are four requirements. One, a sale, which no doubt a sale took place. Number two, the seller knew the particular purpose. Here, the particular purpose is the side walls for a motorhome. That's a very particular purpose. The three is the buyer relies upon seller's skill or judgment. Crane is the biggest and the best not only in the United States, but most people say the world at performing this type of function. These walls are for exterior of a motorhome. They know what they're doing. The fourth requirement are the goods are not fit for a particular purpose. Well, that's quite apparent. The walls blistered, popped, peeled, allowed water in and mold to form and causing a worthless motorhome. The particular purpose of the exterior side walls of the motorhome are different from the interior of a cabinet or an interior wall of a bathroom. These must be watertight. Pontiac RV's position is the motorhome was used for the ordinary purpose, not a particular purpose. It was used to drive around, have fun in, go to ball games, et cetera. Well, the particular purpose of the component is for exterior walls. Even if the court goes with it has to be for an extra particular purpose. There are two different allegations in the complaint that are not attacked by Pontiac RV's affidavit, and that is that it was to be used as a mobile office and it was to be used as an outward appearance of the business. It can't be used as an outward appearance of business when it's the ugliest motorhome on the block. Finally, the case of Wooding said this is a bonafide issue of fact, and a federal insurance company says it's a question of fact for the jury along with Janssen. With regards to a particular purpose, we cite two cases. Overland Bond, in that case, the particular purpose was when a salesman told the car dealership he needed a reliable car, and the appellate court said that's a particular purpose enough to need a reliable car. Isn't this supposed to be something different from the ordinary? Isn't that what that means? For instance, if I need a reliable car, how is that different from the ordinary? The court in Overland Bond found that that was a particular purpose. What court was that? Appellate Court 1972. Well, the good news is, though, that we're not required, as is the trial court, to have to accept prior decisions from the appellate court. We can instead impose a standard that they must make good sense. How does that make good sense, counsel? I just pointed out what other appellate courts have found, Your Honor. Well, why should we follow? Well, in this case, the particular purposes are sidewalls of a motorhome. I'm talking about the business about the purpose of this. Gee, I need a reliable car. I guess that makes you different from everyone else who buys a car. Well, in this case, it's alleged in the complaint that they need it for a mobile office, and we need it for an outward appearance of our concrete foundation business, and that was the particular purpose. It's hard to have an outward appearance of your business to look good when you have an ugly motorhome. Addressing Count 1 against Pontiac RV, the product liability count, the trial court dismissed Pontiac RV as a Pontiac RV ID crane as a component manufacturer. The problem with this is Crane argues that it was Alpha's manufacturing process that was defective, not the component. Alpha's bankrupt. If Crane convinces a jury that it was Alpha's process that was defective, then no one is available for the jury to award damages against. Pontiac RV should stand in the shoes of Alpha. In Kellerman, the Illinois Supreme Court said retailers are subject to strict liability. If a manufacturer has not answered or no longer exists or will not be able to satisfy, you should keep in the retailer. In Bastion, Federal Court Northern District of Illinois said the problem is in a product's liability suit. We do not know yet which product caused the loss. Here, is it the component or is it the process, so you keep in the retailer. In Gilmore and Williams, Williams Central District of Illinois federal case, the courts stated their reluctance to dismiss non-manufacturing defendants. Addressing Count 8 against Crane, the product's liability cause of action, the court dismissed that on a de minimis injury. The defendant in the trial court and in the appellate court argues four cases, the only four in Illinois to address de minimis theory, and that is Pansini, which was a lease that was requiring 99.5% compliance. Instead, it only had 94.9953% requirement. The appellate court argued or stated that that was close enough. Chicago Title and Trust, an annexation issue, where 49 feet separated the gap in continuous land, and the appellate court said that's close enough. In People v. Durham, where the court said a $10 or $15 credit towards the defendant's fine is de minimis and will not address it. In Zwick, a police officer was not deprived of his property rights where he lost no money, therefore it was de minimis. None of these cases involve a personal injury. What was the personal injury here? The personal injury here is the plaintiff's wall's blister. It's like fiberglass, so you get fiberglass underneath your fingernails. You slice your fingers when you try to wash it, when you brush up against it. When your eight-year-old granddaughter goes to help grandpa wash it, she cuts herself. It's very sharp. It pops out blisters. So you have cut fingers every time you go to wash it, brush up against it, any time you go to. How about after the first time using gloves? Would that have stopped the personal injury? If you wore gloves to wash a car, I wouldn't know, sir. I've never worn gloves. Did this happen more than once? Yes, sir. To more than one person also. So that's the personal injury? That's the personal injury alleged. Okay, go ahead. In Ruben v. Marshall Field's public court case, the plaintiff had an eye makeup remover, and she had an allergy to it, went to trial, jury awarded $1,250 in damages. The question for the Fourth District that Crane makes is it should be de minimis. Anything less than a certain dollar amount shouldn't be allowed in personal injury action. That would be new law in the state of Illinois, and does this appellate court wish to decide what dollar amount damages must be alleged to even be able to present a cause of action to the trier of fact? Addressing account four, Pontiac RV's failure to supply insurance policy for a service contract. We cite Cummings Food, which says an agent must obtain the appropriate insurance coverage ordered by the customer. And Bison Enterprises, the fact that the warranties are in the purchase agreement, is prima facie evidence that they're part of the bargain. In McDonald's v. Butler, when two contracts are signed simultaneously, the same parties, as part of the same transaction, they're viewed as a single contract. Here, we signed all the documents, the $161,000 motorhome and this extended warranty, all at the same time, same parties signed them. We bought the contract and the motorhome at the same time for the same $161,000. In the bill of sale, was there any amount set apart for the cost of the warranty? No, Your Honor. It was all included in the $161,000. In Omni Overseas Trading, the cause of action was stated when the broker procured insurance and later the policy was canceled, but the broker failed to notify the insured. Here, Pontiac RV gives them the extended warranty policy and never tells them the policy didn't exist or was never existing or was being canceled until after they filed their claim. In Talbot, there was a cause of action for an agent failing to act with promptness in notifying the insured that an application for life insurance was rejected. It was the same thing here. Here's your insurance policy. You have it. Now, two and a half years later, we've got the walls blistering out, which are covered by the policy. I'm sorry, that policy was canceled. You have to notify them promptly. In Feeley, the court said this is a factual issue for the jury. The question remains, and Pontiac RV, Heritage, and MBA never addressed this, and it's their duty to do so. If they're claiming this is a service contract under the Illinois Service Contract Act, they have to show that they meet all the requirements of the Illinois Service Contract Act, and then they're not subject to the Illinois Insurance Code. If they're subject, if they want to take protection or are trying to get protection off one against the other but not both and they don't want either of them to be applied against them, under the Illinois Service Contract Act, 215 ILCS 152.20 subsection C, a service contract reimbursement insurance company, that's Heritage, and MBA, that issues a service contract shall be deemed to have received payment if the service contract holder, that's Safari, paid for the service contract. And they paid the $161,000. Nobody doubts that. What that goes into is counts 11 and 12 against MBA and Heritage, their failure to repair this pursuant to the warranty or insurance policy. Counsel, I want to go back to the count two implied warranty and no-truth ability. It's a peculiar procedure or history in this case. It appears that you filed that count in the original complaint and the second amended, original complaint, amended complaint, and second amended complaint, and then abandoned it as far as the third and fourth amendment complaints are concerned, and then it reappears in the fifth? The trial judge, Judge Kelly, ordered me not to replete it in the third and fourth. And then in order to preserve it for this appeal, we merely put it in, after everything was taken care of as the fourth, we pled the fifth. He gave us permission to plead the fifth so that we could preserve it and then dismissed all at the same time. So it was your position throughout that you wanted to preserve your claim on this? Absolutely, and that's why we did the fifth amended. And Judge Kelly told you don't include it, but you'll be permitted to do that? Yes, sir. Okay, go ahead. I'm sorry, Your Honor. Under counts 11 and 12, the failure of MBA and Heritage to repair, the trial court dismissed that under two theories. First, one is a lack of consideration, and the two is the expiration of the in-board service agreement. Under the lack of consideration, if this is a service agreement, which they argue it is at some times, then it's authorized for the Service Contract Act that they shall be deemed to have received payment if the service contract holder, Safari, paid for the service contract. Under the expiration of the ISA in-board service agreement, the in-board service agreement expired on December 31, 2004, and pursuant to subpart 16.3, it applies to all motorhomes delivered to dealers prior to December 31, 2004. The evidence showed, and it was presented, that it was delivered to Pontiac RV on November 8, 2004, and inside the service packet that would be given by Pontiac RV to the Safaris is the extended warranty contract by MBA and Heritage saying, here it is, here's yours. It was delivered on November 8, but it was still dismissed by Judge Kelly. AB Freightline says all pleadings and factual data must be liberally construed in favor of the opponent to summary judgment. Motz says when a contract is subject to more than one interpretation, summary judgment is not appropriate. The defendant relies upon omnitous merging and states the case stands for the construction of a contract as a question of law for the trial judge. Two sentences later in the same appellate court decision, the court says, although the question of whether a contract is clear or ambiguous is a question of law for the court, the meaning of any ambiguity found by the court is a question of fact for the jury. The defendant relies on Lazar and Perks to strike the affidavits to Patton and Gray, the two former employees of Alpha Manufacturing, but both of those appellate court decisions hold that personal knowledge is all that is needed in the affidavit, and same as alleged. The final question is does Illinois Insurance Code Section 155 apply? NRA Automobile Professionals Bankruptcy Court, Northern District of Illinois 2007 answers that. It says a provider of a service contract is not subject to the requirements of the Illinois Insurance Code if the service contract provider satisfies the reserve required by statute. Otherwise, is subject to the insurance code. And they cite Griffin Systems, the appellate court there, 505 Northeast 2nd, held that service contracts are insurance contracts covered by the Illinois Insurance Code. It's the defendant's burden to show that they've complied with the Illinois Service Act. Otherwise, the Illinois Insurance Code applies. If the contract provided by Pontiac RV is an insurance policy and Section 155 applies, then plaintiffs should have the opportunity to have their day in court. If this is not an insurance policy, then the Illinois Service Contract Act applies and the safaris pay the premiums and MBA and heritage are deemed to have received payment. Thank you very much. Thank you, counsel. Who will be speaking first? Ms. Stewart. Good morning. May it please the court. Counsel. I represent Pontiac RV, who is here on several counts alleged by the appellant. I will address first the implied warranty of merchantability and Section 155 of the insurance code and Pontiac RV's waiver arguments with regard to both. Is Mr. Devlin correct with regard to what Judge Kelly said concerning this count? I don't believe so, Your Honor. I believe that plaintiff did, in this case, preserve claims on other counts in their third and fourth amended complaints, and they did not preserve their claim in the implied warranty of merchantability claim. You mean Judge Kelly did not tell them, don't refile this? He said that it may be refiled. I don't remember the exact docketing statement on the third and fourth to be repled if facts are present that show that there's a claim. However, on both, I believe, our implied warranty of fitness for a particular purpose and products liability claim, he made similar comments, and those were both repled in both the third and fourth amended complaints. Well, it's in the fifth. Correct. Is there any precedent for the Foxcroft Doctrine to apply to a situation like this where there are earlier complaints that didn't contain a particular count, but the one at issue and on appeal, in fact, does? I did not find any precedent for that, although the fifth amended complaint was filed basically just for the final order to apply. Was the purpose of Foxcroft to avoid any potential surprise or prejudice to you on exactly what the other side is pursuing and what they may have abandoned? There's no prejudice here or surprise, is there? No, Your Honor. Okay, go ahead. I'd also like to address at this time, since we're on the waiver argument, Section 155 of the Insurance Code, which the impellents addressed, just as a similar argument, Section 155 of the Code was originally asserted in Count 4 of their amended complaints. It was not asserted in the fifth amended complaint against Pontiac RV. They have made those arguments in their appellant brief here, but if you will look closely at Count 4, they did not allege any Section 155 violations in that count against Pontiac RV. Also, with regard to the implied warranty of merchantability claim on the merits, the claim was dismissed pursuant to Section 2615 for a plaintiff's failure to allege sufficient facts to state a cause of action against Pontiac RV. Appellants here have framed the issue differently for the Court, I think, than what is actually on appeal. This is whether or not, after five attempts at pleading this cause of action, they allege sufficient facts to state a cause of action. They cite several out-of-state cases going toward whether or not the delayed defect is of issue here. However, I don't think those, first of all, they're not binding, and I don't believe that they're persuasive, and that that's not really the issue here. The only case that they cite that deals with this specific issue, and they rely on Industrial Steel Service Center, where the defendant argued that the complaint should be dismissed because they failed to allege defects present at the time of sale. The court in that case was a federal court, and it found that it was not necessary that they allege that because of the notice pleading standard. Here, that's not the case, where in state court, the state fact-specific pleading standard applies. Plaintiffs had sufficient time to allege that a defect existed at the time of sale. They failed to do so on multiple occasions. The trial court found that their pleading was not sufficient, and I believe that this case, the court may affirm that ruling on that basis without regard to whether the defect was discovered later and whether or not that's proper. Has the plaintiff raised the issue of promissory estoppel? No, they did not. So that's not before, that wasn't before the trial court? Not to my knowledge. Can you address the count that deals with the service agreement? It looks to me from looking at the documents that there was no charge for the service agreement to the consumer. It was provided as free of charge. But it's undisputed that Pontiac represented to the buyers that they were getting this service agreement. Yes, and at the time, I believe the facts are that they didn't know that it wasn't effective at the time that it was given. Pontiac didn't know. Correct, that Alpha Leisure said all purchasers of Alpha Leisure motorhomes receive these set service contracts. They were then provided with the sale regardless. There wasn't any specific compensation for those service agreements. It wasn't any specific, but it was said that it's included in the sale price. Correct. So you're paying for it. Right. So then the fact that Pontiac gave them something that wasn't worth anything, how does that not result in at least the ability of the plaintiff to at least state a cause of action? The fact is, Your Honor, they didn't. Given multiple opportunities to plead, there really was no cause of action in there. If you'll look at the specific allegations of Count 4, they're essentially muddled saying, we're holding MBA liable for the service agreement, but if they're not liable, then Pontiac RV is, and there wasn't a specific agency claim. There just never was a claim. Well, they said, we entered into a contract to purchase an RV. The contract included an extended service warranty. We had a problem within the time frame of the service warranty, and when we went to submit our claim, we were told no policy existed. Right. But all the cases cited and all the claims were that. . . We're just leaving it right there. Why hasn't it been described by just this book that says a cause of action? Forget about the cases. Just what is missing? They didn't allege sufficient facts that Pontiac RV had any duty to provide. Once it was included as part of the. . . The duty is, this is a car. This is a motor home. That should be true. You have an extended warranty on this, and we're providing that extended warranty because you're paying. . . The implication is you're paying extra. It's included in the price. You get an extended warranty. Is there any dispute at this point, because we're talking about pleadings, that if the extended service agreement existed, they would have recourse? They could get this problem fixed. I mean, you have to assume at this point there is a problem. Right. There may be proof elements later, but there's a problem, and it ought to be fixed. I mean, that's what they're saying, right? Correct. If there were an extended warranty agreement, would that probably apply to it? Well, I think that in this case, this would essentially be an agency claim, Pontiac RV acting as an agent for MBA and providing that service agreement. Pontiac RV, they haven't alleged that Pontiac RV knew that it wasn't in effect, so essentially it would be holding an agent that had no. . . Well, they sold them air. What does they have to know? Well, we didn't know. We sold them air. It was nothing. But we sold it to them. You can't sell air normally without, you know, you didn't prove a fraudulent intent on our behalf. Is that required? Well, I'm not sure that in an agency relationship that the agent has been held viable for providing something that they didn't know was. . . Well, I don't understand how that works. I mean, we all have the experience of going to dealerships and buying vehicles, and if the dealer says, this is what it comes with, here's this whole package and here's the bottom line, write that check. I'm assuming if it says it's coming with A, B, and C, that it's coming with A, B, and C. And I don't think I need to know how it is the dealer understands that or believes it's going to come with A, B, and C. Do I? No, but the contract itself is with MBA. I mean, if you look at the contract. . . Well, I'm buying it from the dealer. I don't, you know, this is just so much internal machinations. Isn't the dealer responsible if he says, we're selling this to you, and here's A, B, and C, and this is the bottom line. This is what you're going to get. But the dealer signed off on it, didn't they? They essentially act as an agent for MBA and signing it for, you know, it's a contract for MBA, but holding the agent then liable. . . And I have no liability if I sell something? Well, it's not imaginary, Your Honor. It's MBA, and they've been brought into the suit based on their liability for a contract that was there or wasn't there, you know, at the time. They had some sort of relationship with Alpha, unbeknownst to Pontiac Garbage. . . This is a pleading issue. Tell me what they should have pled in your estimation that would have avoided having this case dismissed and have stated a cause of action? Well, I'm not sure, Your Honor, because of the fact that as an agent signing off on something, it's an agreement specifically with MBA at Pontiac. . . And these service contracts happen all the time, and I could not find any case law that showed that the agent was then held liable if for some reason there's a dispute based on . . . Well, there's no dispute. Apparently there was no insurance ever provided, even though Pontiac said, yeah, here you go. If this was a small claims case, and it was, you know, a $1,500 car, and you bought it from the dealer, and the dealer says, this has an extended warranty, all you have to do is call this number and get this repaired, and the extended warranty didn't exist for whatever reason, who's responsible? The seller who says, you get an extended warranty with this, and we're charging you for that extended warranty, because I don't care whether it's separated out, it is part of the purchase price here. I mean, that's the way it was represented. What do you think a small claims judge would do? It's hard to . . . You know the answer. . . . speculate on that, Your Honor. No, go ahead and speculate. You know, if there was . . . There would probably be recovery. But because there's a specific contract here, it's our position that that contract, I mean, that it's set out that they have in their hands, I mean, they know that it's with MBA and not with Pontiac RV. But the person who sold it to them is Pontiac RV? Correct. They don't . . . They're relying upon the representation that it actually exists, and that there is such a thing as MBA, or does the purchaser of an extended warranty have the duty to research who the extended warranty is with? Like, I need to know. Well, I'm not sure there's a duty when they have the contract. I mean, you know, if you enter into a contract with another party . . . But it doesn't exist because the person who was acting as agent didn't have the authority to do it. If that's the case, who in this world ought to be more responsible for what happened? You don't need to answer. Your time is expired. Okay. Thank you, counsel. Your time is up, and we'll hear from, who is it, Mr. Wright? Yes, sir. Okay, Mr. Wright, you may proceed. Good morning. Good morning, counsel. Please report, counsel. Counsel. My name is Dan Wright. I represent defendants on Council 11 and 12, and various complaints filed in this matter. Mechanical Breakdown Administrators, Inc. I was named defendant under Account 11, which was for the alleged breach of the service agreement that was provided to plaintiffs by Pontiac RV, and Heritage Warranty Mutual Insurance Risk Retention Group was the insurer under the alleged agreement, had it actually been in force at the time. Counsel, can I ask you to address that issue right off the bat? Yes. Mr. Davlin mentioned 16.3B, I think was the section . . . Yes, sir. And said that these service agreements applied to motorhomes delivered before December of 2004, and that this particular motorhome was delivered in November of 2004. I know it wasn't purchased until February of 2005. Then somewhere along the way, I know that some document issued saying we're no longer doing these service agreements as of a certain date, which was, I think, December . . . applying to purchases after December 31, 2004. Am I right or wrong? You are correct in respect to the date that the agreement between MBA and Alpha terminated, December 31, 2004. The subject motorhome was purchased nearly two months after that. I respectfully disagree with Mr. Davlin's interpretation of paragraph 16.3, which is set forth in our brief. His argument is that the obligations of MBA should apply to any motorhomes manufactured and shipped to dealers prior to the effective date of termination. But earlier in that very same sentence, it says that this agreement is terminated for any reason. Manufacturer, Alpha, not MBA, is still obligated to pay the net manufacturer costs for all in-board service agreements provided on travel trailers and motorhomes manufactured and shipped to dealers. So the manufacturer and ship language applies to the obligations of the manufacturer who is bankrupt and is not a party to this case. Reading on in that very same paragraph, it says, in respect to MBA, if this agreement is terminated for any reason, MBA shall remain obligated to perform all obligations relating to all in-board and service agreements in force prior to the date of termination. The date of termination is December 31, 2004. The motorhome is not purchased until two months later. So under no analysis could that agreement be deemed to have been in force or issued prior to the date of termination. So Council for Plans focuses on language that is applicable to the manufacturer rather than MBA. So in that instance, Pontiac RV takes delivery of a motorhome that it can no longer represent to any purchaser that it has a service agreement, an extended warranty. Judge, this is where this case gets interesting. Is that right? I mean, under your interpretation? I mean, Pontiac took delivery from the manufacturer, the distributor, whoever, and they took it assuming that they would be able to represent that there would be an extended warranty available with this vehicle, which was a used vehicle costing $100,500, most people would be interested in. So they're stuck with, after December 31, assuming they know, with something that they can't sell because nobody is going to buy it without an extended service agreement. Well, Judge, this is where I, there must have been some kind of communication breakdown between Alpha and Pontiac because there was another defendant, actually two other defendants in this case long ago that were not, that the claims were resolved in respect to those defendants. And they were essentially the same as MBA and Heritage. It was Western General and Linden Property Insurance. And so when, in the months leading up to expiration of the contract between when Alpha was still solvent and operating, between General Counsel for Alpha and the folks at Western General saying, here's what we're doing with MBA, we need to make sure that things are in place. So as of December 31, 2004, the customers know that you're in and MBA is out. Okay. So that was the way things went down at the time. So I think that addresses Your Honor's question. So in theory, that would not disadvantage Pontiac RV because there would be, there were ongoing business negotiations to see to it that somebody else would pick up this coverage. Correct. In effect. And the reliance placed upon Alpha was that Alpha was coordinating with Western and with dealers to ensure that those communications were being made so that Pontiac RV would know and that that communication would be made to the customers. But MBA and as a result of their relationship with Heritage, those obligations concluded on December 31, 2004, and would not apply to any agreements issued or purportedly made to be in force after that date. And I can just briefly address one other argument that was made by. What do you mean purportedly? Well, I think counsel takes the position that they are in force, that they have some application to MBA. Well, but they were executed. That's what I'm using. I'm questioning the use of the word purportedly regarding whether or not somebody sold somebody a service agreement. Well, I'm not. Let me rephrase. I think I was unclear. That were purportedly applicable or in force. Correct. Counsel for plaintiffs raises the application of the Illinois Service Agreement Act. That is the first time that that's been raised, either at the trial court or on appeal. So reacting in the moment, my position is that that is waived for the purposes of the bargain on appeal. And frankly, I'm prepared to address the arguments that were raised in the trial court and on appeal, which in respect to consideration have to do with the affidavit of Galen Brotherson from MBA that no such premium was ever received for this service agreement. And there was no contradictory evidentiary material at the trial court to contradict that, to create an issue of fact to defeat some of the judgment. And that's fully briefed in our briefs. Happy to answer any questions. So if I'm not out of line, and maybe I am, did Western General Casualty settle with the plaintiffs? That is my understanding. And was there another defendant that also settled, did you say? My clients are MBA and Heritage, and the other two defendants were Western General and Linden Property Insurance. They were supposed to step into the shoes of MBA and Heritage. My understanding is that those two defendants were. But apparently they didn't make the plaintiffs whole, or they wouldn't be here. I don't know what the amount of the settlement was, but I think the plaintiff's position is that they're not. That's not where the case ends. Okay, thank you, counsel. Thank you. Mr. Falco. Peace of court, counsel, my name is Brad Falco. I represent Crane Composites. Crane moved for summary judgment on counts seven, I'm sorry, eight, nine, and ten of the plaintiff's Fifth Amendment complaint. I'm going to be brief because, in fact, the plaintiff never responded in their reply brief to any of the arguments that we had made in our brief. So briefly, count eight, that is the recovery on a theory of strict products liability. There is a theory in the state of Illinois that basically says that the courts will not spend time on trivial injuries, and that's what we have here. The question was asked, well, how often were these gentlemen actually hurt by washing the motorhome? In fact, Mr. James Zafiri said it happened one time. He got a finger cut, for example, with a Band-Aid. Robert Zafiri testified in his deposition that he cut himself three times each time he was offered a Band-Aid. That was it. This is truly de minimis. The Rubin case the plaintiff relies upon is an interesting case, but that is a woman who applied some kind of makeup or makeup remover at a special field store and really suffered some horrible eye injuries from the application of this material. This is not the same here where you just simply apply a Band-Aid. Implied warranty of merchantability, which is count nine, goes to the issue of privity. The plaintiff agrees. There is no question that privity is required under Illinois state law. So you say to yourself, why are we here? Because the plaintiff thinks that privity should be eliminated. I don't think this Court has heard any good reason for why after all of the cases, the most recent being the Meckler-Tietjen v. Mercedes-Benz case, the courts, and the Illinois Supreme Court as well, have said you need privity unless you've got the personal injury. Here it's interesting too, by the way, counsel, the plaintiff said, well, you know, you really ought to just break through the privity requirement and go directly to Crane. Well, actually here you have to go through three parties, not just go through Pontiac to Crane. Pontiac buys the RV after it has been built by Alpha. It was Alpha that took the Crane product, which is the exterior wall, and applies it to a substrate. So your privity is actually going three steps down. There simply is no privity. There's no reason for this Court to branch out and create a whole new rule with respect to non-personal injury cases. Finally, with respect to the implied warranty of fitness for a particular purpose, that has been addressed ably by Pontiac RV in the briefs. There's one additional argument, though, that's important with respect to Crane Composites, and that is that there was no communication at any point in time between the plaintiffs, Mr. Zafiri and Crane, so that Crane, if there was, in fact, a particular purpose, Crane never knew what that particular purpose was. It makes sense. All they do is they build the outside wall. They never communicate with the party that's claiming the breach of the warranty for a particular purpose. Okay. Thank you, counsel. Ms. Devlin, any rebuttal, sir? Yes, sir. What is your theory of recovery in Count 4? It looked to me from Judge Kelly's order. He said you didn't allege a recognizable theory or cognizable theory. Count 4 is based on the MBA Service Agreement, and it's against Pontiac RV. In that case, we cite to the Court Cummings Food, where the agent must obtain the appropriate insurance, and this was inappropriate. And one of the questions I think you had was the other carriers that we settled with, Western General and Linden Property Insurance, they settled for $10,000. Their policy was totally different. They did not cover manufacturing defects. So they just paid the cost of defense and settled out day one. And once again, Cummings Food, an agent must obtain the appropriate insurance covered by the customer. They gave us MBA Heritage Policy, which is PRIMO policy, would cover manufacturing defects. And now they say, oh, that didn't exist. Here, we're going to give you Western General's, but it doesn't cover manufacturing defects. Well, you must obtain the appropriate coverage. They gave us the gold standard. As a matter of fact, that's what it says, gold standard extended warranty by MBA. And so that's what they gave us. But then they said, oh, two and a half years later, that policy never did exist. Here's a policy that doesn't cover manufacturer's defects. The second one was Bison Enterprises, where if you buy it at the same time, two contracts are the same as one. And Omni Overseas Freighting, when the broker procured insurance and later the policy was canceled, but the broker failed to notify the insured, there is a cause of action. And in Talbot, the cause of action for an agent failing to act with promptness and notifying the insured that an application for life insurance was rejected. And once again, all of this states a cause of action. And pursuant to Feely, it's a factual issue for the jury. I'm not sure that I fully understand how you answered Judge Pope's question about the theory. The theory is... I mean, you said you gave us an extended warrant and you didn't. Correct. Well, what legal theory is that based upon which would require you to prove? What, like we relied on it? Yes. And did you say that? Yes. Is that pled? Yes. If we had this, we would be in whole shape. We would not be harmed if we had this active policy. That is alleged in the complaint, except for $100 deductible. Other than $100 deductible, we would be made whole. And that is alleged in the complaint. Now, as a matter of fact, that might not be true in the sense that you might have a dispute. If there were an extended warning, there was a case about that, then somebody might say, well, we don't have to pay for that. We only have to pay for 80% of it. Obviously, we're not at that point. Correct. In this case, it was $100 deductible. The question about out-of-state cases by Pontiac RV, and I cited Northern District of Illinois, I cited Supreme Court of Kansas, Supreme Court of Massachusetts, the important thing to remember is this is the uniform commercial code. And the reason it's uniform is all 49 states, and Louisiana in some instances, have a plan where you're supposed to be making this uniform decision so that no matter where you're dealing with, whether it's an Illinois sale or a Missouri sale or anyplace else, the courts are to find it uniformly. So, yes, you are not bound by out-of-state decisions. We all know that. But it's supposed to be taken into consideration when we're talking about the uniform commercial code. With regards to the Section 155 and Count 4 that Pontiac RV pointed out, once again, that was a Judge Kelly issue. He said, don't replete it. And I'm not going to go against a trial judge. Everybody knows what happens when you do that. With regards to the service agreement you just spoke, you had a question about was there a cost to it. Yes, there was. And in the service agreement, it explains how MBA collects the money for it. But it was charged for it. It wasn't a free gift from MBA. With regards to the privity argument by Crane, once again, why should Crane benefit from Alpha's bankruptcy? If Alpha wasn't bankrupt, it would be involved in the suit, and it would be sued by a third-party defendant, Crane, for saying, I've got privity with you, and it didn't work. Thank you, Your Honor. Thank you, Counsel. Thank you, Mr. Chairman. I advise there be recess for a few moments.